1
2
3
4
5

Amy E. Clark Kleinpeter, State Bar Number 223491
Clark Kleinpeter Law
14431 Ventura Blvd., #750
Sherman Oaks, CA 91423
Telephone: (626) 507-8090
Fax: (626) 737-6030

6

Attorney for Angel Malave, Plaintiff

7
8
9

**UNITED STATES DISTRICT COURT**

10
11

**CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| Angel Malave, an individual,<br>　　　　　　　Plaintiff,<br><br>vs.<br><br>DEBT RESOLUTION<br>CENTER, f/k/a<br>FREEDOM DEBT CENTER, a<br>California Corporation;<br>NOTEWORLD, LLC, d/b/a<br>NOTEWORLD SERVICING<br>CENTER, a Delaware limited<br>liability company,<br>NATIONWIDE SUPPORT<br>SERVICES, INC., a California<br>corporation and Does 1 to 10,<br><br>Defendants<br>. | Case No. CV11-7371 R (JEMX)<br>*Hon. Manuel L. Real*<br><br>SECOND Amended Complaint<br>For<br>　(1) Fraud<br>　(2) Violation Of Consumer<br>　　　Legal Remedies Act<br>　(3) Violation Of The Electronic<br>　　　Funds Transfer Act, 15<br>　　　U.S.C. § 1693 et seq.<br>　(4) Negligent Infliction of<br>　　　Emotional Distress<br><br><br>Courtroom: 8, Spring Street, 2nd<br>floor |

13
14
15
16
17
18
19
20
21
22
23
24
25
26

27

COMES NOW the plaintiff Angel Malave, complaining of defendants DEBT

28

RESOLUTION CENTER, INC., a California corporation, DEBT

RESOLUTION CENTER, LP, a California limited partnership,

NATIONWIDE SUPPORT SERVICES, INC., a California corporation and

Does 1 through 10, Inclusive, and alleging as follows:

### GENERAL ALLEGATIONS COMMON TO ALL COUNTS

THE PARTIES

1. At all times herein material, defendant DEBT RESOLUTION CENTER, INC, was a corporation, company, or other business or associative entity, organized and existing under and by virtue of the laws of the State of California or of one of the United States, and was doing business in the County of Los Angeles, State of California under the name of Freedom Debt Center and then Debt Resolution Center.

2. At all times herein material, DEFENDANT DEBT RESOLUTION CENTER, INC. received compensation for engaging in the business of constructively receiving money through its agent for the purpose of distributing same among creditors in payment or partial payment of the obligations of a debtor, plaintiff Mr. Malave.  As such, it was a prorater within the meaning of Financial Code § 12002.1 and pursuant to *Nationwide Asset Services, Inc. et al v. Preston DuFauchard* 164 Cal. App. 4th 1121 (2008).

3. At all times herein material, defendant DEBT RESOLUTION

CENTER, LP, was a limited partnership, corporation, company, or other business or associative entity, organized and existing under and by virtue of the laws of the State of California or of one of the United States, and was doing business in the County of Los Angeles, State of California under the name Freedom Debt Center.

4. At all times herein material, DEFENDANT DEBT RESOLUTION CENTER, LP received compensation for engaging in the business of constructively receiving money through its agent for the purpose of distributing same among creditors in payment or partial payment of the obligations of a debtor, plaintiff Mr. Malave.  As such, it was a prorater within the meaning of Financial Code § 12002.1 and pursuant to *Nationwide Asset Services, Inc. et al v. Preston DuFauchard* 164 Cal. App. 4th 1121 (2008).

5. Defendant Debt Resolution Center, Inc. and Defendant Debt Resolution Center, LP, both have as registered address 3 Whatney Ste 200, Irvine, California 92618 and they share an agent for service, John Nazarian at the same address.

6. Defendant Debt Resolution Center, Inc. and Defendant Debt Resolution Center, LP are related entities and while in existence since January of 2009, were doing business as Freedom Debt Relief in 2009.

They are referred to hereinafter as "DRC".

7. At all times herein material, Defendant NATIONWIDE SUPPORT SERVICES, INC. (hereinafter "Nationwide") was a corporation organized under the laws of California. Nationwide has its principal offices in Irvine, California.

8. At all times herein material, Defendant NATIONWIDE was a for-profit company and business partner of DRC engaged in managing, counseling, settling, adjusting, prorating and liquidating the indebtedness of debtors.

9. At all times herein material, Defendant NATIONWIDE was a check seller within the meaning of Financial Code § 12002(a) pursuant to *Nationwide Asset Services, Inc. et al v. Preston DuFauchard* 164 Cal. App. 4th 1121 (2008).and an agent for DRC.

10. At all times herein material, plaintiff Angel MALAVE, was an individual residing in the county of Los Angeles, State of California.

11. The true names and capacities, whether corporate, associate, individual or otherwise, of defendants Does 1 through 10, inclusive, are unknown to plaintiff who sues said defendants by such fictitious names. Each of the defendants designated herein as a Doe is negligently or otherwise legally responsible in some manner for the

events and happenings herein referred to and caused injuries and damages proximately thereby to the plaintiff, as herein alleged.

12.     Plaintiff will ask leave of court to amend this complaint to show their names and capacities when the same have been ascertained.

13.     At all times herein mentioned, defendants, and each of them, were the agents, partners, joint venturers, representatives, servants, employees, successors-in-interest, co-conspirators and assigns, each of the other, and at all times pertinent hereto were acting within the course and scope of their authority as such agents, partners, joint venturers, representatives, servants, employees, successors, co-conspirators and assigns, and that all acts or omissions alleged herein were duly committed with the ratification, knowledge, permission, encouragement, authorization and consent of each defendant designated herein.

**The partnership of DRC and Nationwide – the companies act together to ensnare and defraud consumers desperate for debt relief, including Mr. Malave**

14.     DRC operate "front-end" debt settlement companies that hold themselves out as providing debt settlement services for consumers indebted with credit card debt

15.     DRC performs the "front-end" marketing and sales of debt settlement services to consumers, obtains executed agreements for

same, and then refer consumers to Nationwide for the so-called debt settlement services.

16.     Defendant Nationwide provided training, including sales scripts and all contracts and agreements, to DRC.

17.     When a consumer became a customer of DRC, that customer's file was immediately forwarded to Nationwide.  Nationwide handled the client from that point forward.

18.     Defendant Nationwide performs the actual "backend" debt settlement services for consumers to whom "front end" debt settlement companies have successfully marketed debt settlement programs.

19.     Consumers signing up with the DRC do not know their private finances are being seen and worked on by DRC's business partner Nationwide.

20.     When Consumers contact customer support individuals at Nationwide, those Nationwide employees state they are with customer service, so that consumer customers believe they are still talking to DRC employees.

21.     Nationwide email addresses end with "csc" for customer service, rather then have an email address which would give away that they are at a different company then DRC.

22.      Consumers signing up with DRC do not know that Nationwide accesses their trust accounts to pay itself, to pay DRC, and occasionally, for a minority of consumers, to pay creditors.

23.      DRC are feeder-marketing agents for Defendant Nationwide and engage in securing debt settlement clients for Nationwide.

24.      Defendant Nationwide itself fosters the development of such feeder "front-end" debt settlement companies through a "fast-track" program whereby individuals with little or no resources or experience can become affiliates of Nationwide, capable of holding themselves out to consumers as successful businesses actually engaged in helping consumers avoid bankruptcy by negotiating settlement of consumers' credit card debt.

25.      Virtually all of the key functions that DRC claims to perform are actually performed by NATIONWIDE.

26.      DRC performs the marketing functions designed to enroll consumers in a debt settlement program.

27.      Upon information and belief, Nationwide is responsible for negotiating the settlements with consumers' creditors.

28.      Nationwide and DRC promote debt settlement programs through standardized contracts.  These contracts include a debt

settlement agreement with marketing companies, DRC, and a "Sign Up Agreement" with NoteWorld, a company out of Tacoma, Washington that sets up trust accounts for the consumers, accessible by Nationwide.

**<u>Faced with endemic predatory practices in the debt settlement industry, most states have adopted statutes regulating debt settlement activities, including limitations on fees that consumers may be charged.</u>**

29.      California's Check Sellers, Bill Payers and Proraters Law, Financial Code § 12000 et seq., prohibits abusive debt settlement practices, including the charging of predatory fees and the time at which such fees are to be paid.

30.      Defendant charged a 17% fee to Mr. Malave in the written agreement.

31.      This fee violates the California Check Sellers, Bill Payers and Proraters Law (Financial Code §123 wherein a prorater's services may not exceed in the aggregate twelve percent (12%) for the first three thousand dollars ($3,000), eleven percent (11%) for the next two thousand dollars ($2,000) and ten percent (10%) for any of the remaining payments distributed by a prorater to the creditors of a debtor, except for payments made on recurrent obligations.

32.      The central role of private civil actions in the enforcement of California's Check Sellers, Bill Payers and Proraters Law (Financial Code

§12000, et seq.) is the Consumer Legal Remedies Act (Civil Code §1750, et seq. "CLRA"). The CLRA prohibits deceptive acts or practices in the sale or lease of goods and services to consumers.

33.     At all times material to allegations made in this Complaint, Defendants were mindful of the history of predatory practices in the debt adjusting industry and mindful of regulations governing that industry, including those of California.

34.     Defendants knew that the initial fees involved in debt settlement program carried out by them, and as promoted by their affiliates, including FDC, were criminally illegal and unfair in that they exceeded the amount permitted by Financial Code §12314, rendering their debt settlement contract void. Defendants failed as proraters, pursuant to Financial Code §12314(c), to at least once each month pay not less than 70 percent of all funds received from the debtor to the creditors of the debtor.

35.     Nationwide, nonetheless, initiated automatic transfers from Malave's trust account, for purposes of paying the illegal and unowed fees, and Nationwide thereafter paid the illegal and unowed fees, all for the purpose of carrying out the subject debt settlement program and unjustly enriching itself. Nationwide's misconduct is continuing in nature.

36.     Defendants promoted, contracted for, and carried out (or held itself out to consumers as carrying out) debt adjusting services for Malave, and directly or indirectly secured for themselves a portion of the illegal and unowed fees paid by Malave.

37.     Defendants knew that fees associated with the debt settlement program earned out by them, and promoted by their "front-end" affiliates, including FDC, substantially and invariably exceeded 10% of any one payment made by Malave.

**DRC and Nationwide are partners and jointly liable under direct, vicarious and participatory liability.**

38.     Defendants are joint and severally liable for the acts of each other under the following theories of direct, participatory and vicarious liability.

39.     NATIONWIDE Defendants ratified any wrongful conduct of DRC.

40.     DRC ratified any wrongful conduct of NATIONWIDE.

41.     DRC and NATIONWIDE act as partners in their debt settlement business.  Sean Cowell, the unofficial vice president of operations at Debt Resolution Center and a partner-owner of the company, refers to Nationwide as Debt Resolution Center's "partner" and

stated that DRC considered Nationwide to be one with DRC, testifying at his deposition that Nationwide is "our partner.  Yes.  We --we consider them 'us.'"

42.     Nationwide provides training on all aspects of Debt Resolution Center's business, including client intake,

43.     Nationwide provides all agreements and notices for Debt Resolution Center to provide to its clients.

44.     Nationwide refers to Debt Resolution Center's clients as Nationwide's clients or customers.

45.     Nationwide  keeps custody of all client information, including the agreements between consumer clients and Debt Resolution Center.

46.     For these reasons, when this pleading references the liability of one Defendant it applies equally to the other Defendant, unless otherwise indicated.

**Mr. Malave, desperate to reduce his debt while facing cancer, relied on DRC's fliers and hard-sell techniques taught by Nationwide and signed up to be a DRC customer**

47.     In 2007-2009, Plaintiff Angel Malave began to experience financial strain and difficulties in paying his credit cards because of the economic downturn that this country has experienced, which caused his income to temporarily decrease as his salary was almost 100%

commission sales.

48.     Mr. Malave was making payments on his credit accounts, falling behind at times but not more than 30 days before paying.

49.     In January 2009, Mr. Malave found out he had cancer and worried he would likely miss months of work, which would effect his commission-based income and bonuses.  He was afraid for his life and he did not want to leave his family with the credit card debt he had accumulated.

50.     Mr. Malave felt he needed a quick solution to settle the debt so that no matter the outcome of his potentially terminal illness, he would not leave debt to his family.

51.     In 2008 and January 2009, Mr. Malave had been getting official looking fliers from Freedom Debt Relief (now called Debt Resolution Services).  This flier was designed to mimic a governmental document, and came folded with a form number "1040-1120S" in block type on the front of the sealed flier.

52.     These fliers were distributed in January 2009 by DRC, who designed them itself by copying another front-end debt settlement company.  The fliers were sent out using demographic data and targeted people in Mr. Malave's Antelope Valley neighborhood, which was hard

hit by the recession.

53.     These fliers gave close to an exact amount of Mr. Malave's

debt and informed him how, by calling Defendant, he could lower his

monthly payments and  pay off all debt within 3 years.

54.     The flier specifically promised the following:

a.   "0% Interest Rate";

b.   "Reduce Payment up to 40%";

c.   "Become Debt Free in 24 months";

d.   "Save $46,017 in principle and interest";

e.   "22.9 months to be debt free"; and

f.   "Interest Rate 0%"' and

g.   "Approval ID R12-028284".

55.     Relying on the flier, Mr. Malave contacted DRC for help in

lowering his credit card debts because he feared he may be close to

dying.

56.     In reliance on the information on the flier, Mr. Malave called

Debt Resolution Center's number in February 2009 and spoke to a

consultant named Bonnie Bertrand.  As she had been trained by

Defendants, Ms. Bertrand told Mr. Malave That Freedom Debt Relief

(DRC) would:

a. "Help you achieve financial freedom",

b. "Avoid complicated bankruptcy procedures",

c. "Eliminate your debt in as little 3 years",

d. and that "usually the purpose of the lawsuit is to force a settlement on the matter. In our experience, most creditors would rather not go to the expense of suing and simply try to negotiate a settlement.",

e. that "Our Company maintains a very professional and cooperative relationship with the creditors in order to reach the most favorable settlement offers for our clients."

f. And that the Defendants helped many, many consumers reach favorable settlements on their debt and avoid bankruptcy.

57. All the statements provided to Mr. Malave by Ms. Bertrand and other DRC employees were according to the scripts and training provided by their business partner, Nationwide. Ms. Bertrand and other DRC employees were trained to provide the false information in an effort to get Mr. Malavo to sign up for program whereby he paid high fees to Defendants for little or no work.

58. In February 2009, DRC and Nationwide had actual

knowledge that the promises made verbally, like the information in the flier, were false. This was particularly true in that DRC had knowledge that the majority of their customers did not complete the program and did not settle their debts because the customers money was going to fees to the Defendants rather then settlements.

59.     In February 2009, DRC and Nationwide had actual knowledge that they had no special relationships with creditors and that furthermore, some creditors would refuse to settle with debt settlement companies.

60.     In or about February 2009, relying on their verbal promises of freedom from debt, their statements about large numbers of happy satisfied clients, and their purported relationships with creditors, Malave and Defendants entered into a written agreement (the "Agreement") whereby Defendant Freedom Debt Center would provide debt management services and attempt to settle Malave's consumer debt with his creditors for less than .50 on the dollar.

61.     Pursuant to the terms of the agreement, Defendants would receive 17% of Malave's total debt as a "service fee." Malave's total debt in the agreement was $32,030.50.

62.     Pursuant to the terms of the agreement, 100% of the first

three payments by Mr. Malave went directly to Defendants' fees and none to his trust account; therefore for at a minimum of three months, Defendants took fees without doing any work other then misleading Mr. Malave so that he would join the program.

63.     DRC provided literature stating Malave would pay "0" interest to creditors through their plan, allocated over 36 months. That of Malave's total debt at inception, $32,030.50, Malave would only pay $21,460.44 over the same 36 months according to Defendant's proposal.

64.     In or about February 2009 Malave deposited $628.12 into Defendant Noteworld LLC pursuant to his agreement with Defendants.

65.     Malave also signed a release with Freedom Debt (Debt Resolution) which allowed this defendant to communicate with his creditors and to "to communicate, validate, negotiate and settle my/our debts, with all settlements subject to my/our final approval."

66.     Notwithstanding the "subject to my final approval" language in the communications release, Malave also signed a Pre-Authorization Settlement Release which allowed DRC to accept on Mr. Malave's behalf, without any further communications, any settlement offers for under 50% of what the creditor claimed was owed and furthermore, to deduct said settlement amount from Mr. Malave's trust account for the

purpose of paying the creditor, again without further permission or communication being necessary.

67.     As part of signing up with Defendants, Mr. Malave executed a Debt Settlement Agreement ("DSA") between DRC and himself for the purpose of settling the enrolled accounts.  The recitals of this DSA provided that DRC agreed "to provide debt settlement services to. . . [Mr. Malave] under the terms and conditions of this Agreement (the "Service")."

68.     In addition, the DSA specifically incorporated by reference a Funds Transfer Schedule ("FTS") for the creation of a settlement reserve account.  The FTS, by the contract terms of the DSA, would be sent to Mr. Malave in a "Welcome Packet" provided to him at a later date.

69.     Mr. Malave neither discussed nor saw the Funds Transfer Schedule for his settlement reserve account until days after signing his DSA with DRC.

70.     The Compensation clause of the DSA states that "in consideration for the [debt settlement] Service provided" by the DRC, Mr. Malave was to pay DRC a Service Fee equal to 17% of the Program Debt.  Approximately 5% to 17% of the estimated settlement amount, including the Service Fee, was to be paid upon acceptance into the

program over a 90 day period.

71.     Most importantly, this same clause mandates that Mr. Malave "not make or request changes to the Funds Transfer Schedule for the first 90 days following commencement of . . . [his] participation in the program or the first three payments, whichever comes first."

72.     Furthermore, the DSA provides that "the execution of this Agreement represents the consent of . . . [Mr. Malave] to allow . . . [DRC] to draft by EFT the Services Fee from . . . the NoteWorld account established" by Mr. Malave for the purpose of settling his debts.

73.     As such, DRC drafted the DSA in such a way as to grant themselves the exclusive rights to control the amount of funds transferred from Mr. Malave' bank account to the settlement reserve account that he established with NoteWorld for the first 90 days of the Agreement and to determine the percentage of the Service Fee to be paid within this 90 day period.  As demonstrated below, DRC used these contractual rights to ensure that 100% of these initial payments were allocated to pay itself and defendant NoteWorld.

74.     Per the DSA, Mr. Malave contracted with DRC for the settlement of his debt totaling $21,691.94.  Per the contract, he was obligated to pay a 17% Service Fee totaling $3,687.66.  Additionally, Mr.

Malave had to pay an amount of $1,201.86 to $3,687.66 within 90 days of being accepted into the program.

75.    In order to pay for DRC' services and pay off his creditors, Mr. Malave was obligated to establish a trust account with NoteWorld.

76.    Also on or about February, 2009, the employees for DRC that enrolled Mr. Malave into the Debt Settlement Program provided him with a Sign Up Agreement ("SUA"). This SUA was meant to be a contract between defendant NoteWorld and Mr. Malave for the creation of a settlement reserves account. The monies transferred to this account were to be used for the settlement of the debt enrolled in DRC' Debt Settlement Program by Mr. Malave.

77.    Unknown to Mr. Malave, DRC then turned over his account to Nationwide, who used the permission provided to Debt Resolution to pay themselves as well as Debt Resolution from the Noteworld trust account.

78.    On or about March 2009, funds to create Mr. Malave' settlement reserve account with defendant NoteWorld were transferred on a monthly basis from his bank account via Electronic Funds Transfer ("EFT") to NoteWorld. These monthly drafts were performed according to the FTS and a document entitled "Monthly Draft Schedule" sent to Mr. Malave in his "Welcome Packet."

79.     This "Welcome Packet" and all further communications were with employees at Nationwide, but they deliberately misled Mr. Malave, and pretended to be employed at a department within Debt Resolution.

80.     The pre-determined allocation of the funds established by Defendants and transferred from Mr. Malave' bank account to NoteWorld and then to Defendants made it impossible for Mr. Malave to accrue any funds in his trust account for the first 90 days of the contractual relationship.

81.     As demonstrated by the FTS and Monthly Draft Schedule, the primary purpose of Mr. Malave' monthly payments from February, 2009 to May 2010 was to pay the Defendants for services not yet rendered.  The accruing of settlement reserve funds for the settlement of Mr. Malave' debt was not the primary goal of the purported Debt Settlement Program until a full 15 months after Mr. Malave entered into his agreement with defendant the DRC.

82.     The flier had directly implied that Mr. Malave's payment to the debt settlement program would be in place of his previous payments made on his debt.

83.     Once enrolled in the DRC' Debt Settlement Program, Mr. Malave was given advice and instructions on how to default on his

enrolled accounts, how to deflect creditors calling him regarding these accounts and, as a consequence, how to incur legal liability.  However, all this advice was actually provided by Nationwide.

84.      In reliance on the assurances made by Defendants' employees, Mr. Malave followed the instructions given to him.  He allowed his accounts to go into default.

85.      Also in accordance with the DRC' advice, Mr. Malave told his creditors to stop calling him regarding his debts and directed them to contact the DRC.

86.      Mr. Malave' creditors continued to call Mr. Malave.  In response to their continued calls, Mr. Malave sent letters explaining that the DRC was going to negotiate and settle Mr. Malave' outstanding debts with them.  These letters were provided by Defendants.

87.      As a result of Defendants instructions to Malave to stop paying on his consumer debts listed with Defendants in or about February 2009, Malave was sued in Los Angeles Superior Court, North District on four of his six debts.  The case numbers are 09C05156; 09C05681; 09C05604; and 09C04313.

88.      The latter case resulted in a judgment against Malave for $5,824.30.

89.     Nationwide provided legal advice – forms but also detailed, applied information on how to fill out the forms and then reviewing and editing of Mr. Malave's documents to be filed in court.

90.     Nationwide's advice included a formulaic motion for arbitration which was improper for Los Angeles Superior court.

91.     Mr. Malave lost his first motion for arbitration when he wrote it with the help and advice from Nationwide, so he hired a paralegal to redraft that motion and to fight his other collection suits.

92.     Until he had to hire the paralegal, Mr. Malave continued to pay the Defendants their monthly fees, a portion of each which was transferred to Nationwide and then a percentage of that would go to Debt Resolution Services.  However, the DRC and Nationwide rendered no debt settlement services on behalf of Mr. Malave and defendants made no payments on behalf of Mr. Malave.

93.     Malave is informed and believes that his credit rating has suffered extreme damage as a result of four lawsuits filed against him and the six accounts which were charged off.  While Mr. Malave was having trouble paying more than the minimums or paying on time each month, his payment history was much better prior to signing with Defendants and quitting all payments and being sued four times.

94.     Additionally, Malave paid out considerable sums fighting the four consumer collection actions simultaneously without any assistance from Defendants.

95.     Malave is further informed and believes, and thereon alleges, that as a result of Defendants actions he was under undue stress and this effected his precarious health while he was undergoing chemotherapy and after as well.

96.     Defendants made no payments on behalf of Malave to his creditors and made no attempts to settle his debts in a timely manner, if at all.

97.     As aproximate and foreseeable consequence of the Defendant's malicious and purposeful trickery alleged herein, Malave has suffered, and will continue to suffer, damages in an amount in excess of the minimum jurisdiction of the Court, according to proof at trial.

**FIRST CAUSE OF ACTION:  FRAUD *Against all Defendants and Does 1 - 10***

98.     Plaintiff here incorporates and realleges by reference all preceding paragraphs, as if each were here separately alleged in full.

99.     At the time the flier was printed and distributed by Debt

Resolution Center and relied upon by Mr. Malave, Debt Resolution Center knew the statements on the flier were false and had no intent to follow through on any of the promises.

100. Debt Resolution Center created and distributed a flier with known false information, including the following:

a. "0% Interest Rate" – Debt Resolution Center knew that interest would continue to accumulate, together with late fees and penalties, on all debts entered into the program;

b. "Reduce Payment up to 40%" -- Debt Resolution Center knew that there were no guarantees as to the reduced settlement amount, if any, a creditor would accept and further more, the inclusion of the fees to Debt Resolution Center and Nationwide meant that even if all creditors accepted the reduced settlements, the overall payment would still be above 40% as the Defendants fees were at least 17% of total debt.

c. "Become Debt Free in 24 months" -- Debt Resolution Center knew that there were no guarantees that consumers who entered the program would become debt free and that furthermore, the majority of programs were approximately 36

months and that the majority of consumers did not complete

the program and did not become debt free.

d. "Save $46,017 in principle and interest" – at the time of

sending the flier, Debt Resolution Center had no idea of the

amount of Mr. Malave's debt nor how much could be saved

as this amount relies on the time Mr. Malave would take to

pay off his debt, whether or not he filed bankruptcy, and

whether or not debt entered into their program was

successfully settled at all.

e. "22.9 months to be debt free" -- Debt Resolution Center knew

that there were no guarantees that consumers who entered

the program would become debt free and that furthermore,

the majority of programs were approximately 36 months and

that the majority of consumers did not complete the program

and did not become debt free.

f. "Interest Rate 0%"' – Debt Resolution Center knew that

interest would continue to accumulate, together with late fees

and penalties, on all debts entered into the program;

g. "Approval ID R12-028284".  Sean Cowell, the acting vice

president of operations for Debt Resolution Center, admits

that this number was made up and there were no approval

ID's used by Defendant, this number was put on the flier

solely to convince prospective customers like Mr. Malave that

they were specially chosen because Debt Resolution Center

could settle their debts when Debt Resolution Center had in

reality no idea if Mr. Malave could be helped by their

program, especially as the vast majority of debt settlement

customers drop out before their debts are settled.

101.    Defendants distributed the fliers with the false information to Mr. Malave, intending him to rely on these false assertions and to call the DRC office.

102.    After receiving the flier, Mr. Malave called and spoke with a salesperson, Bonnie Bertrand, at DRC.

103.    Ms. Bertrand, as she had been trained and following the scripts provided to her by defendants, told Mr. Malave the following:

a. Signing with DRC would "Help him achieve financial

freedom", which as known false as most consumers who

joined did not receive financial freedom, they had few to no

debts settled and often their credit worsened and they would

be sued;

    b. Signing with DRC would "avoid complicated bankruptcy procedures" with implications that bankruptcy would ruin someone's life and credit for 10 years, which is false as bankruptcy can provide debt relief for much less cost and consumer's credit begins improving immediately after filing;

    c. Signing with DRC would allow Mr. Malave to "eliminate his debt in under 3 years", which is false as Mr. Malave – as is true for most consumers who joined DRC – did not have any debts settled by DRC and instead he was sued, which is a very common reaction of creditors when consumers join debt settlement companies,

    d. and that "usually the purpose of the lawsuit is to force a settlement on the matter. In our experience, most creditors would rather not go to the expense of suing and simply try to negotiate a settlement.",   This is false and known to be false, DRC and Nationwide had actual knowledge that a large percentage of their clients were sued and ended up with judgments and that some creditors would not only sue, but would refuse to even work with debt settlement companies.

    e. that "Our Company maintains a very professional and

cooperative relationship with the creditors in order to reach the most favorable settlement offers for our clients."  This is known to be false, creditors and debt settlement companies have quite adversarial relationships as debt settlement companies tell their clients to not pay creditors and take money their clients could have used to pay creditors, DRC and Nationwide understand their own industry and were absolutely telling untrue statements when saying that they have cooperative relationships with creditors;

f.  And that the Defendants helped many, many consumers reach favorable settlements on their debt and avoid bankruptcy.  This is untrue and known by DRC and Nationwide to be untrue as the vast majority of consumers who signed up with DRC and/or Nationwide had little to no debt settled and many end up sued and often file bankruptcy after having lost thousands to high fees to DRC and/or Nationwide.

104.   Ms. Bertrand followed the practices and procedures developed by Nationwide and she was trained in these practices and procedures by Nationwide and DRC.

105.     Defendants' practices and procedures involved providing false information, that Nationwide and DRC knew was false, to consumers such as Mr. Malave with the intent of getting Mr. Malave to rely on the false statements and sign up with DRC.

106.     Joining DRC was be to Mr. Malave's detriment as it cost him significant amounts of money, ruin his credit and cause him to have to fight legal battles against creditors and create great stress.

107.     DRC and Nationwide knew that signing with their company would be to Mr. Malave's detriment as much fewer then 10% of consumers who joined DRC and Nationwide ended up debt free, and many ended up sued.

108.     The statements of the DRC employees, including Bonnie Bertrand, show that DRC was acting as agent for Nationwide who was actually responsible for all promised actions.  These statements were false when made, and it must have been known to defendants that they were false or defendants made the statements with recklessly without knowing whether they were true or false.

109.     The DRC made the foregoing statements with an intent to defraud Mr. Malave and others similarly situated, that is, the DRC made the foregoing representations for the purpose of inducing the Mr. Malave

(and others in debt) to rely upon them and to act in reliance thereon so that he would pay a sizable fee to the DRC and Nationwide.

110.    At all times herein material, Mr. Malave was unaware of the falsity of the foregoing representations, and acted in reliance upon the truth of those representations, and was justified in relying on those representations and in agreeing to pay the DRC for their promised negotiation and settlement of debt.

111.    Furthermore, at all times herein material, the DRC concealed and suppressed from plaintiff the material facts that:

    a. that the DRC, in conjunction with Nationwide,had developed their sales pitch, written their customer agreements and structured their FTS in such a way as to mislead and to deceive plaintiff into believing that they would be providing him with services for payment;

    b. that the DRC, in conjunction with, had developed their sales pitch, written their customer agreements and structured their FTS in such a way as to exempt themselves from responsibility for their fraudulent and willful injuries to plaintiff in violation of Civil Code § 1668;

    c. that defendant Nationwide would actually be charging plaintiff

monthly processing fees in excess of those recited in the SUA presented to and signed by plaintiff at DRC offices;

d.  that the DRC and Nationwide intended to take all of plaintiff's money for their own personal use and investment before providing any service to Plaintiff;

e.  that the DRC and Nationwide would refuse to communicate with Mr. Malave's creditors and collectors;

f.  that the DRC and Nationwide's failure to provide plaintiff with services would worsen his credit situation and relationships with his creditors;

g.  that following the DRC' advice would result in lawsuits followed by judgments against Mr. Malave which would lead to garnishment, liens and levies.

h.  That Nationwide would access Mr. Malave's trust account to pay itself and DRC.

112.    The failure of the Defendants to disclose these facts, along with their concealment or suppression of those facts, was done by the DRC with the intent to defraud plaintiff.

113.    These facts were all known by DRC and Nationwide and intentionally hidden from Mr. Malave.

114.     As a direct and legal result of the foregoing fraud, deceit and misrepresentation by the DRC and their principal company, Nationwide, the plaintiff Angel Malave has suffered monetary damages at an amount to be determined at trial but known to be within the jurisdictional limits for unlimited matters in this court.

115.     Additionally, as a direct and legal result of the foregoing fraud, deceit and misrepresentation by the DRC and their principal company, Nationwide has caused Mr. Malave to suffer harm and severe emotional distress, including mental distress, fraud, deceit and misrepresentation by defendants, and each of them, mental suffering, mental anguish, fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, physical pain, and other highly unpleasant mental reactions, now and into the future.

116.     Additionally, as a direct and legal result of the foregoing fraud, deceit and misrepresentation by the DRC and their principal company, Nationwide has caused Mr. Malave to suffer harm and severe emotional distress, including mental distress, fraud, deceit and misrepresentation by defendants, and each of them, mental suffering, mental anguish, fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, physical pain, and other highly unpleasant

mental reactions, now and into the future.

117.    The conduct of the DRC and their principal company, Nationwide was malicious, oppressive and fraudulent, and constitutes an intentional scheme to defraud Plaintiff and was intended to cause injury by depriving him of his money and legal rights, and this conduct was carried on by the Defendants with a willful and conscious disregard of Plaintiff's rights.  The Defendants' actions constitute despicable conduct that subjected Plaintiff to cruel and unjust hardship.  Said conduct justifies an award of punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION: Violation Of Consumer Legal Remedies Act against all Defendants**

118.    Nationwide, through it's front-end company DRC for compensation, held itself out to named Plaintiff and to California consumers as engaged in managing, counseling, settling, adjusting, prorating or liquidating the indebtedness of debtors, and/or engaged in such activities with respect to Malave and California consumers.

119.    Nationwide, and its "front-end" affiliates, including DRC, are proraters and otherwise engaged in debt adjusting within the meaning of Financial Code §12000, et seq. and with respect to conduct alleged in this Complaint.

120.    Defendants violated Civil Code § 1750 et seq. and otherwise engaged in unfair and deceptive acts or practices, committed in trade or commerce, impacting the public interest, which conduct proximately caused injury or harm to named Plaintiff and California consumers in their business or property.

121.    While services done by salespeople of involved in the sale of credit, such as work performed by mortgage brokers, are outside the scope of the CLRA, debt settlement is a service covered by the law.

122.    Debt Settlement is a service independent of the granting (selling) of the loan.  This service is provided by independent companies that are actually acting in opposition to the original creditors.  The debt settlement services are not ancilliary to the provision of credit; rather, they are a completely separate industry.

123.    The debt settlement itself is a service – there is no "intangible good" being provided by the Defendants or other debt settlement companies.

124.    Nationwide, knowingly aided and abetted "front-end" prorater/debt adjuster affiliates including DRC, in the commission of criminal, unfair, and deceptive practices, including practices violating Civil Code § 1750 et seq., by giving substantial assistance that

proximately caused harm to named Plaintiff to California consumers in their business and property.

125.     The CLRA prohibits specific actions and Defendants violated the CLRA by engaging in many of these actions.

126.     Defendants violated the CLRA jointly and acting in tandem as business partners, assisting each other on all activities

127.     Defendants knowingly and purposefully violated the CLRA in the following methods:

 a. Violated Civ. Code, § 1770 (a) (1) "Passing off goods or services as those of another" by passing off the services of Nationwide as being provided by the individuals at DRC who had wooed Mr. Malave and built up a relationship of trust with him;

 b. Violated Civ. Code, § 1770 (a) (3)" Misrepresenting the affiliation, connection, or association with, or certification by, another" by completely denying any relationship between the two business partners and deliberately creating confusion so that consumers thought all work was being performed by DRC;

 c. Violated Civ. Code, § 1770 (a) (14) "Representing that a

transaction confers or involves rights, remedies, or

obligations which it does not have or involve, or which are

prohibited by law". Defendant Nationwide non-lawyer

employees provided legal representation to Mr. Malave;

d. Violated Civ. Code, § 1770 (a)(14) "Representing that a

transaction confers or involves rights, remedies, or

obligations which it does not have or involve, or which are

prohibited by law". Defendants together provided a debt

settlement service that violated California prorater and check-

seller laws, including taking much higher fees then allowed

by law and having non-lawyers provide legal advice;

e. Violated Civ. Code, § 1770 (a)(16) "Representing that the

subject of a transaction has been supplied in accordance with

a previous representation when it has not." DRC employees,

as trained by Nationwide, and DRC's advertisements,

promised that the debt settlement service Mr. Malave was

buying would be able to work out settlements with creditors,

that Mr. Malave would save $46,017 in principal and interest

and that he would be "debt free" in either 22.9 or 24 months.

This was not a service Defendants did or could provide.

f.  Violated Civ. Code, § 1770 (a)(19) by inserting an unconscionable provision in the contract.  DNC distributed and convinced Mr. Malave to sign the contract, written and distributed by Nationwide, where Defendants convinced Mr. Malave that they should assume and exercise authority to pay themselves illegal and unowed fees from Plaintiff's bank account.

128.    At the time that assistance was rendered, Defendants were each aware of their respective roles in these wrongful activities.

129.    Defendants are each jointly liable for the entire loss suffered by the Plaintiff.

130.    Plaintiff requests injunctive relief to stop the illegal business practices of Defendants, including the stopping the continuing violations of Civil Code §1750 et. seq, requiring the Defendants to register with the Department of Corporations under §1750, and stopping the unauthorized practice of law by Defendant Nationwide.

131.    Plaintiff additionally seeks actual damages, punitive damages, court costs, attorney's fees and any other relief that the court deems proper.

**THIRD CAUSE OF ACTION: Violation Of The Electronic Funds**

**Transfer Act, 15 U.S.C. § 1693 et seq. against NATIONWIDE**

132.    Plaintiffs refer to and incorporate by reference the above paragraphs as though set forth fully herein.

133.    The Electronic Funds Transfer Act ("EFTA") provides a basic framework establishing the rights, liabilities, and responsibilities of participants in an electronic fund transfer system. 15 U.S.C. § 1693. The primary objective of the EFTA "is the provision of individual consumer rights." *Id*.

134.    Mr. Malave maintained an "account" as that term is defined in 15 U.S.C. § 1693a(2), and is a "consumer" as that term is defined in 15 U.S.C. § 1693a(5).

135.    Nationwide engaged in "unauthorized electronic funds transfers," as that term is defined in 15 U.S.C. § 1693a(11), by debiting the bank account of Mr. Malave without his permission.

136.    Nationwide engaged in "unauthorized electronic funds transfers," as that term is defined in 15 U.S.C. § 1693a(11), by debiting the Noteworld Trust accounts of Mr. Malave without his permission.

137.    The EFTA provides that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and copy of such authorization shall be provided to the

consumer when made." 15 U.S.C. § 1693e(a). "In case of preauthorized transfers from a consumer's account to the same person which may vary in amount…the designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with the regulations of the Board, of the amount to be transferred and the scheduled date of the transfer." 15 U.S.C. § 1693e(b).

138.    Nationwide was not the designated payee, yet it is Nationwide that debited Mr. Malave's account without any advanced notice.

139.    The EFTA's implementing regulations, known as Regulation E and codified at 12 C.F.R. §§ 205 et seq., provide: "Preauthorization electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer." 12 C.F.R. §205.1(d). When "a third party payee fails to obtain the authorization in writing or fails to give a copy to the consumer…it is the third-party payee that is in violation of the regulation." Id. at ¶ 2.

140.    Defendant Nationwide had no permission, written or otherwise, by Mr. Malave to debit his bank account or his Noteworld Trust Account.

141.     Defendant Nationwide violated the EFTA because Nationwide was initiating electronic fund transfers from Mr. Malave's bank account or his trust account without obtaining prior written authorization.

142.     Further, Nationwide did not provide Mr. Malave with copies of their authorizations or provide reasonable advance notice of the amount to be transferred and the scheduled date of the transfer.

143.     Accordingly, under 15 U.S.C. § 1693m, Plaintiff Mr. Angel Malave seeks damages, statutory damages, costs of suit, including reasonable attorneys' fees, and such other further relief as the Court deems appropriate.

**THIRD CAUSE OF ACTION: Negligent Infliction of Emotional Distress against all Defendants**

144.     Plaintiff realleges and incorporates herein by reference the allegations of all paragraphs above.

145.     Defendant Debt Resolution and its principal Nationwide had a duty towards Mr. Malave based on their contract, their verbal promises, and the power or attorney signed by Mr. Malave;

146.     Defendants engaged in negligent conduct and/or willful violations of statutory standards in their conduct towards their customer,

Mr. Malave.

147.    As a proximate result of defendants' conduct, Mr. Malave has

suffered from great stress, resulting in anxiety and sleeplessness,

headaches and decreases in appetite.  All this abuse occurred when Mr.

Malave was being treated with chemotherapy and trying to beat cancer

so he could remain alive and provide for his family.

WHEREFORE, Plaintiff prays for recovery on each cause of action against

Defendants and each of them as follows:

1.    For compensatory damages;

2.    For statutory damages

3.    For actual damages including but not limited to emotional distress

leading to physical and mental symptoms of suffering, costs of litigation on

the four credit card suits, and damage to Plaintiff's credit reputation in

amount to be determined at trial;

4.    For Plaintiff's attorney's fees and costs;

5.    Punitive damages against Defendants for their unlawful, oppressive

and fraudulent acts against Plaintiff;

6.    Injunctive relieve including, but not limited to, an order stopping

Nationwide's practice of unauthorized practice of law and ceasing all

Defendants' violations of checksellers and pro-raters law in California;

7.    Such other and further relief and support that the court deems just and proper.

Dated: October 14, 2011           Clark Kleinpeter Law

By _____
      Amy E. Clark Kleinpeter
      Attorney for Angel Malave, Plaintiff